# REPORTS OF CASES

### DETERMINED IN

# THE SUPREME COURT,

## APRIL TERM, 1862.

---

## BEATTY *v*. CLARK *et al.*

Where a declaration of trust, accompanying a conveyance of real property, pro-
vided that parties making advances to the trustee to a specified amount for
certain designated purposes, with the consent of persons previously named in
the declaration as beneficiaries of the second class, should stand as to tho ad-
vances so made in the same position and receive payment in the same manner
and proportion as such previously named beneficiaries: *Held*, that the trust
estate was not liable for advances made to the trustee for any other than the
purposes designated in the declaration, nor for advances made for those pur-
poses by third persons without the consent of the beneficiaries.

Thus, where the purposes designated in the declaration of trust were to secure ad-
vances to pay off a debt to a particular estate—to purchase and locate school
warrants on certain lands, and to raise a crop upon the lands for the year 1856;
and the trustee in one instance borrowed money to harvest the crops of 1856,
and to put in the crops of 1857, and gave his promissory note as trustee for
the amount borrowed, including also an amount for storage on grain, and
stated in the note that for its payment all the property held by him in trust
was pledged; and in another instance borrowed money in 1857 to meet the
expenses of future farming operations, and gave his note for the same as trus-
tee, in which he also stated that all the property held by him in trust was
pledged for its payment: *Held*, that the statement of the trustee in the notes
did not create any lien upon the trust property; that even if raising a crop for

1856, as mentioned in the declaration, implied also the harvesting of the crops for that year, no allowance could be made on that account, inasmuch as it did not appear from the note or otherwise how much of the amount was borrowed for that purpose ; that the other objects for which the money was borrowed, as stated in the notes, were not embraced by any of the purposes designated in the declaration of trust; and for the payment of the money the trustee had no authority to pledge the trust property; and further, that he had no authority to accept the moneys and place the claims thereupon arising in the second class of claims secured, even if the moneys had been advanced for the express purposes of the trust, without the consent of the persons holding the claims of that class.

A trustee, acting under a declaration of trust, expending money not expressly authorized by the declaration, is not entitled to reimbursement out of the trust property, unless the expenditure was necessary for the preservation of the property, or to prevent the failure of the designated trusts ; and a third person advancing money to the trustee stands in no better position with reference to the trust property. If the third person advance the money with the approbation of the grantors in the trust deed, he can only enforce the equitable lien thus obtained against the residuary interest coming to them after all the claims mentioned in the declaration are satisfied.

If in an instrument conferring a power there be an inconsistency between the recital stating the consideration moving the donor to the execution and the subsequent terms defining the power, the recital will not operate as a limitation upon the power.

Equity will not aid the nonexecution of a power; but when a party undertakes to execute a power, and by mistake does it imperfectly, equity will, in favor of creditors and others peculiarly within its protective favor, aid the defective execution.

Thus, where there is a defect in the execution of a power to make a mortgage, the condition of the mortgage not following the terms of the power, and the design to execute a mortgage in pursuance of the power is apparent, and the object sought by its execution is substantially accomplished, equity will afford relief and enforce the mortgage. This it will do either by directing a correction in the condition of the mortgage, and then enforcing the mortgage in its corrected form, or by construing the defectively executed instrument in connection with the power to which it refers, thus qualifying and restricting the condition, and giving effect to the mortgage conformably to the intention of the donors of the power, and of the mortgagor.

Property is conveyed in trust to pay classes of debts in a certain order. H and others are creditors and beneficiaries under the trust of the second class; M. & Co. are creditors of the trustee claiming a lien upon the trust property, but subordinate to the claims of H. and others; M. & Co. threaten to bring suit and subject to sale the trust property, in order to reach the residuary interest of the grantors in the trust deed after satisfaction of the preferred claimants under the trust; to prevent this, and in consideration of an agreement by M. & Co. not to sue, H. and others execute a power authorizing the trustee to mortgage the real property held by him in trust to M. & Co., as security for the payment of their claims; the mortgage was executed accordingly, but by mistake the

condition of the mortgage did not follow the terms defining the power; the delay stipulated for by H. & Co., and recited in the power as its consideration, was obtained in full: *Held*, that equity will afford relief and enforce the mortgage.

*Held, further*, that under a stipulation for an equitable settlement of the rights of the parties upon the facts presented, it is immaterial which course of the two above mentioned for the correction of the defect is pursued; that the result of either is to give M. & Co., the mortgagees, priority in the security which H. and others, donors of the power, possessed by the trust fund to the extent of the latter's respective claims, and to place these claims in the position which the claims of M. & Co. would have occupied but for the execution of the power and mortgage, H. and others preserving relatively to each other, in their postponed claims upon the trust fund, the order of their original classification.

APPEAL from the Eleventh Judicial District.

Three separate suits in equity were commenced below, each for the purpose of obtaining relief against the same trust estate, a sale of the trust property, and a settlement of the claims of the different beneficiaries. In the Court below the actions were consolidated and referred to a referee. From the decree of the Court, based upon the report of the referee, an appeal was taken to this Court, and a stipulation entered into between all the parties, substantially to the effect that their respective rights, legal and equitable, should be finally settled by the decree of this Court, without regard to technical objections to the manner of their presentation.

The following are the facts of the case, so far as it is necessary to state them to understand the opinion:

Previous to February, 1855, one C. I. Hutchinson and one Angus Frierson had large transactions together. Frierson held property of Hutchinson and of Hutchinson & Greene, a partnership composed of Hutchinson and Charles E. Greene, as security for the payment of indebtedness of Hutchinson and of Hutchinson & Greene to him, by deeds absolute upon their face, but intended as a mortgage. Frierson died in February, 1855, and one Henry E. Robinson was appointed his administrator. A settlement was negotiated during the year 1855 between Robinson, as administrator of Frierson, on the one hand, and Hutchinson and Hutchinson & Greene on the other, and was finally consummated on the twenty-

fourth of January, 1856. The settlement agreed on was this: That in consideration of the payment of the sum of $15,000, Robinson, as administrator of the estate of Frierson, would reconvey to Hutchinson and Hutchinson & Greene, or to such person as they might designate, the property held by Frierson as security for the payment of the indebtedness of Hutchinson and Hutchinson & Greene; and in order to enable Hutchinson & Greene to make the payment and have a fund to carry on operations, Hutchinson induced certain of his friends, to wit: Abner C. Hunter, D. O. Mills, Paul Morrill, and James Anthony, James Haworth, W. H. Watson, Clark & Gass, Jos. W. Winans, W. T. Grissim, & Co., Jerome C. Davis and Allen Cadwalader, to agree to loan to Hutchinson & Greene money for those objects, upon condition— Hutchinson & Greene being otherwise pecuniarily embarrassed— that the property should be conveyed to one R. C. Clark, who was to hold the same as trustee, to secure the loans. In pursuance of the agreement, on the twenty-fourth of January, 1856, Abner C. Hunter advanced $6,500, Clark & Gass advanced $5,000, Paul Morrill and James Anthony advanced $1,000 each, and D. O. Mills advanced $2,400. The sum of $15,000 was paid to Robinson, and thereupon the possession of the real and personal property was delivered to said R. C. Clark. Immediate measures were taken to prosecute farming operations on the land, and the farming operations were carried on from that date, without cessation, until since the commencement of these suits. Deeds conveying and perfecting the title to the property were made to Clark; and the latter executed a declaration of trust, dated January 24th, 1856, by which he declared that he held the property for the following purposes, to wit:

"First. To pay Abner C. Hunter, on or before the first day of December next, the sum of $6,500, with interest thereon at the rate of two and one-half per cent. per month from this date until paid.

"Second. After said payment to Hunter shall have been first made, then to pay to D. O. Mills the sum of $2,400; to Paul Morrill and James Anthony the sum of $2,000; to James Haworth the sum of $2,500; to W. H. Watson the sum of $2,500; to R.

C. Clark and John H. Gass the sum of $5,000; to Jos. W. Winans the sum of $5,000; to W. T. Grissim & Co. the sum of $2,000; to Allen Cadwalader the sum of $5,000, or so much of said sums as the parties respectively shall advance for the purpose of paying to Henry E. Robinson, administrator of the estate of Angus Frierson, deceased, the sum of $15,000, or for the purpose of buying and locating school warrants upon land in Yolo county, formerly known as Hutchinson & Greene's Ranch, or for the purpose of raising a crop upon said lands in the present year—said sums not to exceed in the aggregate the sum of $30,000, with interest on the sums so advanced by them and each of them at the rate of two per cent. per month from the time when said advances shall respectively be made, until they are fully paid—it being understood and agreed, that the sums respectively named as to be paid by D. O. Mills, Paul Morrill and James Anthony, James Haworth, W. H. Watson, Robt. C. Clark and John H. Gass, together with the sum first named of A. C. Hunter, have been fully paid and advanced, as of this date; and it is further understood and agreed, that should there not be sufficient funds arising out of the proceeds of the property so as aforesaid assigned and transferred to the said Clark, together with the proceeds of any crops which may be raised on the lands aforesaid, to pay to each of the parties named in this second article the full amount advanced by them, with interest thereon as aforesaid, that then repayment shall be made to them equitably and ratably, in proportion to the sums advanced by them respectively; and should the parties, or either of them, or any other, with their consent, advance any other or further sums, to an amount not exceeding, in the aggregate with the sums already advanced, the sum of $30,000, for the purposes aforesaid, then the person or persons making such other and further advances, shall, as to the advances so made, stand in the same position and receive payment in the same manner and in the same proportion—in the event there shall not be funds sufficient to pay the whole—as parties whose names are above mentioned in this second article.

"Thirdly. After the payments contemplated and provided for in the first and second articles shall have been fully made, and the

parties therein named shall be fully reimbursed the sums advanced or to be advanced by them respectively, with the interest thereon as aforesaid, then to pay W. T. Grissim the sum of $1,000, due to them from Hutchinson & Greene prior to the thirteenth day of September, 1854, or so much of said sum as there may be funds to pay with.

" Fourthly. After the payment to Grissim & Co. aforesaid, the said Robert C. Clark, the trustee, shall receive and be entitled to appropriate to himself, out of the said trust funds or the proceeds thereof, such sum or sums of money as will furnish him a suitable and reasonable compensation for his services as such trustee, under and by virtue of the trusts hereinbefore created.

" Fifthly. After the payments to Grissim & Co. and the said Clark, trustee as aforesaid, then to pay F. W. Hatch, Jr., $3,000, part of the indebtedness due to him and those he represents from C. I. Hutchinson and Hutchinson & Greene, to wit: $9,000, or thereabouts, with the interest thereon as the notes express and as was agreed between the parties, from the —— day of ———— until paid, in consideration that the said F. W. Hatch, Jr., has conveyed by quit claim deed to said R. C. Clark, trustee, all his right, title and interest in and to the lands in Yolo county above mentioned, for the purpose of further securing the parties provided for in the articles of this deed of trust.

" Sixthly. After the payment to F. W. Hatch, Jr., of the $3,000 aforesaid, then to pay to H. O. Beatty, on or before the first day of November, 1856, the sum of $1,000, without interest, provided prompt payment is made by the first day of November, 1856 ; but if not so paid, then the said sum of $1,000 is to bear interest at the rate of one per cent. per month from the first day of May, 1856, till paid.

" Seventhly. After the payment of said sum of $1,000 to the said H. O. Beatty, as aforesaid, then to pay F. W. Hatch, Jr., the ' balance ' of the indebtedness due from C. I. Hutchinson and Hutchinson & Greene to him and those he represents, as recited in the sixth specification of these trusts. It is distinctly understood, however, and is the true intent and meaning of this deed of trust, that all of each class, as before enumerated, are to be paid

in full before any payment is made to any subsequent class ; and should there not be sufficient funds to pay all of any given class, then those parties named in said class shall be paid *pro rata* out of the funds applicable to said class."

One A. W. Hall made advances of money and merchandise to Clark, trustee, for the purposes of the ranch, from May 14th, 1856, to June 1st, 1857. The money and merchandise so advanced were used, and on a settlement between Hall and Clark, the latter was found indebted to Hall in the sum of $14,647.39, for which he executed a note in the words following, to wit :

"SACRAMENTO, June 1st, 1857.

" $14,647.39.

" Sixty days after date I promise to pay to A. W. Hall, or order, fourteen thousand six hundred and forty-seven dollars and thirty-nine cents, being money borrowed of him to harvest the crops of 1856, and to put in the crops of 1857, on the ranch in Yolo county, known as Hutchinson & Greene's Ranch, and for storage on grain, etc. For the payment of this note, the grain now in store with said Hall, and the proceeds of the crop now being harvested, and all the property held by me in trust, is pledged. This note to bear interest at the rate of three per cent. per month from date till paid.

" ROBT. C. CLARK, *Trustee.*"

This note was indorsed by Hall and assigned to D. O. Mills & Co.

On the twenty-fifth day of June, 1857, Clark borrowed of one Edward T. Raun the sum of $16,500, and executed to him therefor a note in the words following, to wit :

" SACRAMENTO, June 25th, 1857.

" $16,500.

" Four months after date I promise to pay to Edward T. Raun sixteen thousand five hundred dollars, with interest thereon at the rate of three per cent. per month from date till paid—said interest payable monthly—being for money borrowed of him to carry on

the ranch in Yolo county, known as Hutchinson & Greene's Ranch. This note to be paid out of the proceeds of the crop raised on the ranch this year ; and the whole crop and all the property held by me as trustee is pledged for the payment of this note.

"ROBERT C. CLARK, *Trustee.*"

The money borrowed of Raun was used in the business of carrying on the ranch. Hutchinson knew of the loan the day it was made, and approved of it. Gass knew of the loan, and advised Raun "it was a good and safe loan, as Raun would be the first paid ; that the crop then being gathered would be appropriated to that purpose." There was no evidence that any other person named in the declaration of trust knew of the loan until several months afterwards.

On the fourteenth day of October, A. D. 1858, the trustee was indebted to D. O. Mills & Co. in the sum of about $26,000, and they were threatening to sue for the same and enforce a sale of the trust property. To prevent this, on that day the following instrument was executed by some of the beneficiaries under the trust deed :

" Know all men by these presents, that we, the undersigned, *cestui que trusts* and beneficiaries in a declaration of trust made by Robt. C. Clark, bearing date the twenty-fourth day of January, 1856, and recorded in the Recorder's office of Yolo county, in consideration that D. O. Mills & Co. will agree to postpone the payment of their demands against said trust property for the term of two years and a half, upon the same being secured by a mortgage upon the real property embraced in the said deed of trust, do hereby consent and agree that Robt. C. Clark, said trustee, may execute and deliver to the said D. O. Mills & Co. a mortgage upon all the real estate held by him in trust as aforesaid, conditioned to secure to the said D. O. Mills & Co. the payment of the debt due them from said trust estate, within the period of two and one-half years from the first day of July, 1858, and bearing interest at the rate of one and one-half per cent. per month, and payable as provided between the said D. O. Mills & Co. and said trustee.

Beatty *v.* Clark.

"As witness our hands and seals, fourteenth day of October, 1858.

|                        |          |
| ---------------------- | -------- |
| " JAMES HAWORTH,       | [L. S.]  |
| " W. H. WATSON,        | [L. S.]  |
| " F. W. HATCH, JR.,    | [L. S.]  |
| " W. T. GRISSIM,       | [L. S.]  |
| " CLARK & GASS,        | [L. S.]  |
| " J. C. DAVIS.         | [L. S.]." |

This paper was signed and executed by James Haworth, William H. Watson, F. W. Hatch, Jr., W. T. Grissim and Jerome C. Davis.

John H. Gass refused to sign and execute it. The name of Gass & Clark, which appears thereto, was signed by Clark without the consent of Gass.

A mortgage was afterwards executed by the trustee to D. O. Mills & Co., dated January 1st, 1859, in which is the following recital referred to in the opinion of the Court:

"And whereas, by a certain instrument in writing, bearing date the fourteenth day of October, 1858, signed by the *cestuis que trust*, or those persons named in said deed of trust as beneficially interested therein, or some of them, consenting that said Robert C. Clark, trustee as aforesaid, should execute to the said D. O. Mills & Co. a mortgage upon the land held by him as trustee, to secure the amount due them as aforesaid: Now, therefore, etc."

The notes secured by this mortgage were three notes of the trustee taken in lieu of the previous indebtedness, all dated January 1st, 1859, and payable respectively: One for $6,800 on the first day of October, 1859; one for $10,000 on the first day of October, 1860; and one for $5,000 on the first day of October, 1861, all bearing interest at one and a half per cent. per month.

The condition of the mortgage referred to in the opinion is as follows:

" Upon this express condition, however, that should the said party of the first part well and truly pay, or cause to be paid, the three several promissory notes hereinbefore mentioned, and each of them, and all interest that may accrue on them, and each of them, according

to the true tenor and effect of said notes, then this conveyance to be void, otherwise, to remain in full force and virtue in law."

The report of the referee contained the testimony, a finding of facts, and a recommendation of a decree ordering a sale of the trust property and a distribution of the proceeds, after payment of costs, to the several claimants in a certain order, and also certain personal judgments. By this decree, Haworth, Watson, Hatch, Grissim, Gass and Davis were placed, in respect to the proceeds of the sale, among the claimants of the second class; D. O. Mills & Co. and E. T. Raun were placed among the claimants of the sixth class, and no priority was given to D. O. Mills & Co. by virtue of their mortgage over those claimants of the second class who had executed the power above set forth.

The decree thus recommended by the referee was adopted by the Court, and judgment entered accordingly.

From this judgment, D. O. Mills & Co., Clark and E. T. Raun appealed.

*Jos. W. Winans,* for Appellants D. O. Mills & Co.

I. The note to Hall, subsequently assigned to D. O. Mills & Co., is a debt of the second class under the declaration of trust. The advances made by Hall to the trustee, for which the note was given, were for a purpose fairly within the language of the declaration characterizing claims for future advances belonging to the second class.

II. The Raun debt is not a charge upon the trust estate. No authority existed in the trustee to create such a debt, and make it a charge against the trust estate as against the *cestuis que trust.* (*Green* v. *Winter,* 1 Johns. Ch. 27 ; *Bastock* v. *Blakeny,* 2 Brown's Ch. 511 ; *Maywood* v. *Johnston,* 1 Hill's Ch. [S. C.] 230.)

There was no acquiescence on the part of the *cestuis que trust* in the contraction of the Raun debt, which would affect their rights under the trust as against Raun. (*Montford* v. *Codogan,* 17 Vesey, jr. 489 ; Hill on Trustees, 255, 256, 563–6, [old paging 382 *et seq.*] ; *Booth* v. *Booth,* 1 Beavan, 130 ; White's leading cases in Equity, [Hare & Wallace's notes] vol. 1, 158, 159, and notes; *Randall* v. *Errington,* 10 Vesey, jr. 428 ; *Whichcote* v. *Lawrence,*

3 Id. 740 ; Hill on Trustees, 72, and note *g*, 793 ; *Brice* v. *Stokes*, 11 Vesey, jr. 325 ; *Phillipson* v. *Gutty*, 7 Hare, 576 ; 27 Eng. Dig. 576 ; *Worth* v. *McAdon*, 1 Dev. & Bat. Eq. 199 ; *Conklin* v. *Wash. University*, 2 Md. Ch. 498.)

III.   D. O. Mills & Co., by virtue of the mortgage made to them by the trustee under the power executed by the *cestuis que trust*, have priority in claim upon the trust property over the beneficiaries in the trust declaration.

1. The mortgage follows the power, and a recital does not control the granting words. (*Huntingdon* v. *Havens*, 5 Johns. Ch. 26–7.)

2. If the mortgage does not strictly follow the power, the intention to follow it is plain, and equity will relieve against the mistake, and will aid the defective execution of the power. (*Wills* v. *Henderson*, 4 Scam. 18 ; *Chamberlain* v. *Thompson*, 10 Conn. 244 ; *Rogers* v. *Atkinson*, 1 Kelley, [Ga.] 12 ; *Argenbright* v. *Campbell*, 3 Hen. & Munf. 144 ; *Parsons* v. *Hosmer*, 2 Root, 3 ; *Beardslie* v. *Knight*, 10 Vt. 190 ; *DeSell* v. *Casey*, 3 Dessau, 85 ; *Sandford* v. *Washburn*, 2 Root, 499 ; *Elmore* v. *Austin*, Id. 415 ; *Peters* v. *Goodrich*, 3 Conn. 146 ; *Withers* v. *Yeadon*, 1 Richardson's [S. C.] Eq. 334 ; *Flagg* v. *Mann*, 2 Sumner, 489 ; *Brown* v. *Bonner*, 8 Leigh, 1 ; *Cook* v. *Preston*, 2 Root, 78 ; *Tilton* v. *Tilton*, 9 N. H. 385 ; *Smith* v. *Allen*, Saxton, 43 ; *Hendrickson* v. *Jones*, Id. 563 ; *Goodal* v. *Field*, 15 Vt. 448 ; Willard's Eq. Jur. 72–5, 300 ; *Wood* v. *Hubbell*, 5 Barb. S. Court, 603 ; *Hunt* v. *Rousmaierre*, 8 Wheat. 174 ; 5 Condensed U. S. Rep. p. 210. See also, 2 Mason, 244 ; 1 Peters, 13 ; 6 Monroe, [Ky.] 311 ; 2 Vesey, sen. 376 ; 17 Johns. 375 ; *Schenck* v. *Ellingwood*, 3 Edwards' Ch. 175 ; *Harrington* v. *Harrington*, 2 How. [Miss.] 701 ; *Cogan* v. *McGee*, 2 Bibb, 323 ; *Leggett* v. *Ashley*, 5 Littell, 178 ; *Marshall* v. *Stevens*, 8 Humph. 159 ; *Bingham* v. *Bingham*, 1 Vesey, sen. 127 ; *Jarvis* v. *Sethan*, 3 Atk. 329 ; *Legall* v. *Miller*, Burnham, 299 ; *Simpson* v. *Vaughn*, 2 Atk. 32 ; *Langley* v. *Brown*, Id. 203 ; *Baker* v. *Payne*, 1 Vesey, sen. 458 ; *Henkley* v. *Royal Ex. Co.* Id. 318 ; Mackworth's case, 1 Eq. cas. ab. 283 ; *Randall* v. *Randall*, 2 P. Wms. 465 ; *Burn* v. *Burn*, 3 Vesey, jr. 473 ; *Taylor* v. *Rudd*, 5 Id. 595, cited—a very strong case ; *Taylor* v. *Wheeler*, 2 Vernon, 564 ; *Finch* v. *Earl of Winchelsea*,

Beatty *v.* Clark.

1 P. Wms. 277 ; *Washburne* v. *Merrills*, 1 Day's Cases in Error, [Conn.] 139.)

3. Equity will reform an instrument executed under a power. (*Wilson* v. *Troup*, 3 Cowen, 200 ; *Cummings* v. *Williamson*, 1 Sandf. Ch. 21 ; *Roberts* v. *Stanton*, 2 Munf. 134 ; *Barr* v. *Hatch*, 3 Ham. [Ohio] 529 ; *Pealt* v. *McCulloch*, 1 McLean, 69 ; 3 Ed. Ch. 175 ; *Bright* v. *Boyd*, 1 Story, 487 ; *Sinclair* v. *Jackson*, 8 Cowen, 581 ; 2 Sugden on Powers, 93, 115, 127 ; 2 Sugden on Vendors, 115 ; *Smith* v. *Ashton*, 1 Freeman, 309 ; 1 Story's Eq. Jur. secs. 159, 160, 170, 174 ; see also, Jeremy's Eq. Jur. 372 ; 2 P. Wms. 490 ; 7 Vesey, jr. 499 ; 2 Vernon, 69.)

4. The reference to the power in the instrument is a sufficient indication of the intent to execute the power. (*Fathergill* v. *Fathergill*, 2 Freeman, 256 ; *Clifford* v. *Burlington*, 2 Vernon, 379 ; *Hollingshead* v. *Hollingshead*, cited 2 P. Wms. 229 ; *Coventry* v. *Coventry*, Id. 222 ; *Sarth* v. *Blanfry*, Gilbert, 166.)

5. Powers are construed in reference to the intention of the parties. (Per Kent, Chan., in *Wilson* v. *Troup*, 7 Johns. Ch. 32 ; *Hinchbroke* v. *Seymour*, 1 Brown's Ch. 395 ; *Tankerville* v. *Coke*, Mosley, 146 ; *Morris* v. *Preston*, 7 Vesey, jr. 547 ; *Ress* v. *Bulkley*, 1 Doug. 292 ; *Bristow* v. *Ward*, 2 Vesey, jr. 336 ; *Talbot* v. *Tipper*, Skinner, 427 ; *Liefe* v. *Saltingstone*, 1 Modern, 189 ; *Roberts* v. *Dixall*, 2 Eq. cases ab. 668 ; *Long* v. *Long*, 5 Vesey, jr. 445 ; *Mansell* v. *Price*, 2 Eq. cases ab. 668 ; *Chamberlain* v. *Thompson*, 10 Conn. 252 ; see also, 3 Term Rep. 365 ; 3 Bligh, 290 ; 11 Johns. 169 ; 7 Price, 281 ; 3 Monroe, 185 ; 4 Term Rep. 748 ; 3 Maule. & S. 89 ; 8 Porter, 205 ; 2 Brod. & Bing. 475 ; 1 Rich.'s Eq. [S. C.] 324 ; 8 Vesey, jr. 574 ; 1 Sugden on Powers, 244.)

6. As the mortgage given recites the power, both are to be construed together. (*Sawyer* v. *Hammott*, 3 Shipley, 40 ; *Price* v. *Bingham's Ex'r.*, 7 Harr. & Johns. 296 ; *Adams* v. *Hill*, 4 Shipley, 215 ; *Lainson* v. *Tremere*, 1 Adol. & Ellis, 792 ; see also, 1 Johns. 221 ; 13 Wend. 122 ; 1 Rich. Eq. 334 ; 2 Gill & Johns. 382.)

*Heydenfeldt* and *Crocker*, for Appellant Clark.

Beatty *v.* Clark.

*Thomas H. Williams,* for Appellant Raun.

I.   A creditor cannot proceed directly, in the first instance, against the trust property, except by reason of the insolvency of the trustee; he must first look to the party with whom he contracted, leaving the latter to his claim for reimbursement upon a settlement with the *cestuis que trust.*   The insolvency of the trustee changes the course of the remedy for obvious reasons.

II.   A creditor cannot subject the trust property to the payment of his debt, unless his claim is of such character that if it had been paid by the trustee, he (the trustee) would be entitled to an allowance of the same upon settlement with the *cestuis que trust.* Although the creditor might, by the terms of his contract, have agreed to look alone to the trust property for payment of his debt, that fact would not change his remedy except as between himself and the trustee.

III.   Upon settlement with the *cestuis que trust,* the trustee, to entitle himself to an allowance for the claims presented by the creditors in this suit (assuming that he had paid them) would be held to show the necessity of the advancement, and the actual use of the funds for the benefit of the estate.   (*Conner* v. *Clark,* 12 Cal. 168; *Haskell* v. *Cornish et al.,* 13 Id. 46, and authorities cited for Respondent; Hill on Trustee, 570.)

IV.   The Raun note was given for money borrowed for the benefit of the estate, and the testimony conclusively establishes the necessity to the estate of the use of that money, and that the money was used for its best interests.   Clark, the trustee, being insolvent, Raun can claim its repayment out of the proceeds of the estate before the payment of other creditors, just as the trustee, if he had personally paid the money, could first claim its allowance out of such proceeds.

V.   The Hall note is not a claim upon the trust estate, for the reason that the money for which it was given by the trustee was not designed or used for the benefit or protection of the trust estate, or for purposes within the scope of the declaration of trust.

VI.   As to the mortgage to D. O. Mills & Co.: 1st, it is void as to third parties, and especially creditors, because the supposed

power upon which it rests was not acknowledged and recorded as required by law.

2. The trustee could not convey without the consent of the *cestuis que trust* given in a legal manner.  (1 Platt on Leases, 123.)

3. The authority to convey, to be valid, must have been executed by all of the *cestuis que trust.*  (Id. 124.)  As it was not concurred in by all, its only effect would be to estop the concurring parties from questioning the necessity of the debt, or the application of the fund as between themselves and the mortgagee.

4. The mortgage, to be valid, must strictly pursue the authority for its execution.  (Dunlap's Paley's Agency, 178, notes *a* and *h.*)  It fails to do so in many respects, the most important of which is the time at which the mortgage, or more strictly, the debt which it purports to secure, falls due.

The power purports to be executed in consideration of the postponement of the debt due Mills & Co. for thirty months, (two years and a half) from July 1st, 1858; in other words, until the first day of January, 1861.  But the mortgage divides the debt into three parts, and fixes the date of payment at fifteen, twenty-seven and thirty-nine months from the date mentioned in the "power."  The whole and only consideration moving the *cestuis que trust,* who joined in the execution of the "power," was the postponement of the debt for thirty months, and yet we find only a small portion of it postponed for that length of time, and even that it extended beyond the time.

It is no answer to the objection, that by departure from the terms of the power, the trustee secured a reduction of Mills' claim.  He had no right to depart from his authority, although such departure might result beneficially to his principal.  (Story on Agency, 176; 5 Johns, 58; 3 Hill, 262.)

*H. O. & W. H. Beatty,* for Respondents Gass, Beatty, Haworth and Davis.

I.   Gass is not bound by the signature of Clark & Gass, affixed by Clark without Gass' consent to the power.  (Collyer on Part. sec. 394, and authorities there cited.)

II.   The mortgage does not follow the power and is not authorized by it, and it is not a case where equity will relieve.

1. There is nothing in the notes or mortgage to correct as mistakes, for it is not contended that they contain anything but what the parties intended them to contain when executed. The difficulty is not that there is any mistake in the terms of the notes or mortgage, but that the parties did not recollect, at the time they executed the same, what were the terms of the power. If this be a mistake in the contract which the Chancellor may correct, then any time a man makes a contract, whereby he expects to make a good speculation and it turns out a bad one, he might come in and ask to have the instrument corrected, not because there was any mistake made in draughting the contract, so as to make it express what was not the agreement, but because one of the parties was mistaken in the result of his contract.

2. Where a power has been imperfectly executed by mistake, accident, or in ignorance, there is no doubt but that a Court of Chancery, in a proper case, may correct it. To make such a case it must appear: 1st, that an adequate consideration was received by the party or parties who executed the power; 2d, that any attempted execution was made without any taint of fraud or unfairness as against the grantor of the power; and if the Court executes the power, it must see that the grantor of the power will not be placed in a more unfavorable position than if the power had been properly executed in the first place. (Story's Eq. Jur. sec. 176.)

*Geo. Cadwalader,* for Respondents James and William Bailey, argued that the Hall and Raun notes were not claims against the trust estate; that they could only become *cestuis que trust* by virtue of a contract to that effect made with the trustee and the *cestuis* named in the declaration of trust, and no such contract was made.

Clark could only bind the estate in the manner mentioned in the declaration of trust; the trust was of record, and Raun and Hall had both actual and constructive notice of its terms. (1 Johns. Ch. 37; Hill on Trustees, sec. 509.)

*J. H. Gass,* one of the Respondents, in *pro. per.*

I. The trust being created by deed, the trustee could not alien-

3

ate or encumber the trust estate so as to bind the *cestuis que trust*. Their consent must be as solemn as the deed to bind them. (1 Johns. Ch. 27 ; 23 Penn. S. R. 44.)

II. The money invested by R. C. Clark and John H. Gass, and secured by the deed of trust, was not invested as partnership funds in the partnership name of " Clark & Gass," but was invested as the individual property of each—that is, equal moieties belonged to each, and could not therefore be sold or interfered with by either only to the extent of his own interest.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

These three cases were argued together, as they all relate to the same estate, and require for their disposition a construction of the declaration of trust, and a determination of the respective rights of the beneficiaries named therein, and of parties who claim to have succeeded to the interests of the beneficiaries, or to have acquired liens upon the trust property. It is the desire of all the parties that their respective rights, legal and equitable, shall be determined and finally settled by the decree of this Court, without regard to technical objections to the manner of their presentation, and a stipulation substantially to this purport is embodied in the records.

The purposes for which the property was conveyed to the trustee are set forth in the declaration of trust executed by him simultaneously with the conveyance. These purposes are there stated to be, to pay different parties various sums advanced by them or to be advanced for certain specified objects, and also to pay certain previous debts of Hutchinson and of Hutchinson & Greene, and a reasonable compensation to the trustee for services in connection with the estate. The claims thus designated are divided into seven classes, and the declaration of trust provides that they are to be paid in their order of classification—all of one class to be paid before any payment is made upon any claims of a subsequent class, and those of any given class to be paid *pro rata* when the funds applicable to that class are insufficient to pay them all in full. The only claim belonging to the first class has been paid, and no further reference to it need be made. The claims under the second class

consist of sums advanced for three purposes — to pay the estate of Frierson $15,000, to purchase and locate school warrants upon a certain ranch or farm in Yolo county; and to raise a crop upon the farm for the year 1856. These sums, according to the declaration of trust, were not to exceed in the aggregate $30,000, and were to draw interest at the rate of two per cent. a month from the time of their respective advances. The declaration designates as having been already advanced at its date, $2,400 by Mills; $2,000 by Morrill and Anthony; $2,500 by Haworth; $2,500 by Watson, and $5,000 by Clark and Gass; and to secure their payment, and also the payment of $5,000 to Winans, $2,000 to Grissim & Co., $2,000 to Davis, and $5,000 to Cadwalader, *or so much of these sums as might be advanced,* as claims of the second class, the conveyance to the trustee was executed. And the declaration of trust in the article relating to this second class of claims also states that it is understood and agreed that "should the parties, or either of them, or any other *with their consent, advance any other or further sums,* to an amount not exceeding in the aggregate with the sums already advanced the sum of $30,000, for the purposes aforesaid, then the person or persons making such other and further advances shall, as to the advances so made, stand in the same position, and receive payment in the same manner and in the same proportion, in the event there should not be funds sufficient to pay the whole, as parties whose names are above mentioned in this second article."

The first inquiry presented is as to the amount of " other or further sums " advanced in addition to those already advanced " when the declaration was executed, which are to be placed under the clause cited in the second class of claims. We say the inquiry is as to the *amount* of such other or further sums, for the fact that further advances were made is not disputed. Winans advanced $650; Grissim & Co. advanced in cash, and what was taken as its equivalent, $2,000; Davis advanced in like manner $2,137.88; and Cadwalader advanced $1,500; all of which sums form claims of the second class. The sums advanced, upon which there was much discussion at the hearing, are those for which the notes of the trustee to Hall and to Raun were executed. We do not, however,

find any difficulty in determining the position of those sums. A slight consideration of the purposes for which advances were to be made, according to the declaration of trust, and of the power of the trustee, will show that they do not constitute claims which can be embraced within those of the second class. The note to Hall bears date on the first of June, 1857, and states on its face that it was given for money borrowed of him " to harvest the crop of 1856 and put in the crop of 1857," and " for storage on grain," without showing how much of its amount was for any one of these objects. The trustee was not authorized to borrow money to put in the crop of 1857, nor was security for advances of this character within the contemplation of the parties when the trust was cre-' ated. The purposes declared, so far as the second class of claims is concerned, were to secure advances made in order to pay off the debt to the Frierson estate, to purchase and locate school warrants, and to raise a crop upon the farm for the year 1856. It may be, as contended by counsel, that the phrase used in the declaration " raising of a crop," implies the harvesting of the crop, as well as its sowing or planting; but this view does not obviate the objection. The note does not disclose, as we have said, the amount borrowed for harvesting the crop of 1856. Nor does the exhibit of items making up the amount of the note, taken in connection with the evidence in the case. Hall was employed as the factor of the crops. Such is the testimony of the trustee, and the advances by Hall were evidently made upon the crop received on storage and the crop anticipated. The note itself specifies that for its payment the grain then on storage with him, and the proceeds of the crop of 1857, then being harvested, were pledged. And though it also states that all the property held by the trustee in trust was likewise pledged, this statement did not of itself create any lien upon the trust property, much less locate the claim arising upon the note among the claims of the second class secured. The trustee could not in this way pledge the property conveyed to him upon specified trusts, so as to give priority to the claim in question over any previously existing claims. The only effect of the agreement, if made, as it undoubtedly was, with the knowledge and approval of Hutchinson and Greene, was to create an equitable lien

upon any residuary interest coming to them after all the claims designated in the declaration of trust were satisfied. The trustee had no authority even to accept the money of Hall and place his claim therefor in the second class, even had it been advanced for the express purposes of the trust, without the consent of the parties holding the other claims of that class; and there is no evidence whatever that any such consent was ever given. And that neither Hall nor the trustee ever contemplated that the claim for the money was to be placed upon a footing with claims of the second class, is further evident, from the fact that the note is made payable in sixty days, and draws a different and greater rate of interest.

The note to Raun bears date on the twenty-fifth of June, 1857, and most of the observations made as to the claim upon the Hall note are applicable to the claim asserted upon this note. It shows on its face that it was given for money borrowed " to carry on the ranch in Yolo "—that is, to meet the expenses of future farming operations; and it expressly provides for its payment out of the proceeds of the crop raised during the year 1857. For its payment the note also declares, that " the whole crop and all the property held " by the trustee are pledged. But that there was no authority in the trustee to execute a lien in this way upon the trust property, much less to place the claim for the money borrowed among the claims of the second class, we have already shown. And as with the Hall note, so with this note, it is evident that neither Raun nor the trustee contemplated that the claim arising upon it should have equality with the claims of the second class, for the note is made payable in four months, and with a different and higher rate of interest.

But it is contended by the learned counsel of Raun that the moneys borrowed by the trustee were necessary for the estate, and must be first paid as a claim created for the protection of the estate, which the trustee would be entitled to have allowed to him upon a settlement. The position of the counsel, as we understand it, is this : that for this money the remedy of Raun was in the first instance upon the trustee personally, who, having paid it, could demand its allowance upon a settlement of his accounts, and its reimbursement out of the proceeds of the estate before distribution

to the *cestuis que trust;* but that the trustee having become insolvent, the remedy of Raun is upon the trust property, from the proceeds of which he is entitled to a like priority.

The answer to this position is plain and conclusive. The premises upon which it rests do not exist. The money borrowed was not necessary for the protection of the estate, or to accomplish any of the purposes designated in the declaration of trust. " To carry on the ranch," which we understand to mean, to carry on farming operations, after 1856, was not a purpose for which the trustee was authorized to borrow or accept any moneys and bind the trust property. The claim thus arising, although it was created with the approbation of Hutchinson and Greene, can only be enforced against the trust property—the proceeds of the crop of the year having failed to pay it—after all the claims mentioned in the declaration are satisfied.

The claims upon the notes to Hall and to Raun being excluded from those of the second class, we proceed to state the established claims of that class ; those which remain unpaid, and their respective amounts. In this statement we do not adopt, in all respects, the findings of the referee. We differ from them in several particulars. We allow some claims rejected by him, and place credits in some instances against subsequent advances, when they were placed by him against advances made for purposes directly contemplated by the declaration of trust. We can only give the result of our examination of the immense mass of evidence, oral and documentary, embodied in the record. It is impossible within the limits of an opinion to comment upon the testimony which relates to each separate claim. The amounts advanced by Mills and Anthony have been paid. The amount stated in the declaration of trust to have been advanced by Watson, was advanced in the form of two notes, one of which was subsequently returned to him, and the other has never been paid. The amounts advanced by the other parties (with the exception of twenty-one dollars and eleven cents paid on the advance of Gass, and five hundred dollars paid on the advance of Cadwalader, and interest on the entire sum to November 21st, 1856) remain due, with interest thereon at the rate of two per cent. a month from their respective dates. These amounts, deduct-

ing the payments in the two instances mentioned, are as follows : $1,000 advanced by Morrill; $2,500 by Haworth ; $2,500 by Clark ; and $2,478.89 by Gass, with interest from January 24th, 1856 ; $2,137.88 advanced by Davis, with interest from April 8th, 1856 ; $2,000 by Grissim & Co., with interest from May 28th, 1856 ; six hundred and fifty dollars by Winans, with interest on five hundred dollars from October 21st, 1856, and on one hundred and fifty dollars from November 12th, 1856 ; and $1,000 of the advance by Cadwalader, with interest from November 21st, 1856. These different sums, with the stipulated interest thereon from their respective dates, constitute the unpaid claims of the second class under the declaration of trust.    A portion of them are now owned by other parties than those named.  The entire claim of Cadwalader has been assigned to James and William Bailey ; and $1,000 of the claim of Clark has been sold to Winans.

So far as the claims of Haworth, Clark, Gass, Davis and Winans are concerned, D. O. Mills & Co. assert that they have acquired a prior right and lien upon the real property held in trust, entitling them to the payment of their own demands to the extent of the claims.    The right thus asserted arises in this way : D. O. Mills & Co. were the owners, by assignment, of the Hall note ; they had also advanced various sums to the trustee and received his notes therefor—one dated November 17th, 1856, for $1,200, bearing interest at the rate of two and a half per cent. a month, and the other dated February 22d, 1858, for $2,668.33, bearing a like monthly interest.  These various sums constituted claims against the trust property, though subordinate to the claims designated in the declaration of trust.    D. O. Mills & Co. had it in their power to subject the trust property to sale in order to reach any residuary proceeds coming to Hutchinson & Greene after the satisfaction of existing claims.    And it would seem that they contemplated legal proceedings to that end.    They also at the same time asserted that by the claim which they held by the Hall note, they were entitled to come in, for a portion at least of such note, as creditors of the second class.    Such being their position, certain of the beneficiaries under the trust deed to Clark entered into an arrangement with them to the effect that they, D. O. Mills & Co., should postpone

the payment of their demands against the trust property for the term of two years and a half from the first day of July, 1858; and that in consideration of such postponement, the beneficiaries referred to should authorize the trustee to execute a mortgage upon all the real property held by him in trust for the security of the demands, payable within that period, with interest thereon at the rate of one and a half per cent. a month. In pursuance of this arrangement, the beneficiaries mentioned executed and delivered to the trustee the following power : " Know all men by these presents that we, the undersigned, *cestuis que trust* and beneficiaries in a declaration of trust made by Robert C. Clark, bearing date the twenty-fourth day of January, 1856, and recorded in the Recorder's office of Yolo county, in consideration that D. O. Mills & Co. will agree to postpone the payment of their demands against said trust property for the term of two years and a half, upon the same being secured by a mortgage upon the real property embraced in the said deed of trust, do hereby consent and agree that Robert C. Clark, said trustee, may execute and deliver to the said D. O. Mills & Co. a mortgage upon all the real estate held by him in trust as aforesaid, conditioned to secure to the said D. O. Mills & Co. the payment of the debt due them from the said trust estate, within the period of two and one-half years from the first day of July, 1858, and bearing interest at the rate of one and one-half per cent. per month, and payable as provided between the said D. O. Mills & Co. and said trustee.

"As witness our hands and seals, fourteenth day of October, 1858.

| | |
|---|---|
| " JAMES HAWORTH, | [L. S.] |
| " W. H. WATSON, | [L. S.] |
| " F. W. HATCH, | [L. S.] |
| " W. T. GRISSIM, | [L. S.] |
| " CLARK & GASS, | [L. S.] |
| " J. C. DAVIS. | [L. S.]." |

Of the grantors of this power, W. T. Grissim was a beneficiary, under the declaration of trust, of the third class, and Hatch was a beneficiary of the fifth class and also of the seventh class. The

signature of Clark & Gass was affixed by Clark without the consent of Gass, and therefore binds Clark alone. Gass refused to execute the instrument. It follows that the instrument must be deemed only as authority to the trustee from Haworth, Clark and Davis of the second class of beneficiaries, and of Grissim of the third class, and of Hatch of the fifth and of the seventh class, to execute to D. O. Mills & Co. a mortgage upon the real property held in trust for the security of their demands. Watson, whose signature is also attached to the instrument, cannot be regarded as having had any claim against the estate, as neither of the notes advanced by him were ever paid.

On the first of January following, the trustee executed to D. O. Mills & Co. a mortgage upon the real property in question, referring in its recitals for his authority in the premises to the instrument already mentioned. At the time, the demands of D. O. Mills & Co. amounted to over $26,000. This amount they reduced to $21,800, and took three notes of the trustee for the same, bearing interest at one and a half per cent. a month, and payable one for $6,800 on the first of October, 1859, one for $10,000 on the first of October, 1860, and one for $5,000 on the first of October, 1861. To secure these notes, the mortgage by the trustee was executed. The mortgage, as we have said, refers in its recitals to the power of October 14th, 1858; in other respects it is in the usual form, with the usual conditions. The question is as to the efficacy of this mortgage. It is objected on the one side that it does not follow the power, and hence is inoperative and void. On the other side, the objection is met by the fact that the purpose desired of D. O. Mills & Co. by the beneficiaries has been accomplished, on the faith that the mortgage was effective, and by the position that the defect in the form of the mortgage may be corrected, and the instrument enforced after its correction.

The instrument of October 14th, 1858, is very awkwardly drawn, but we do not perceive the inconsistency, to which counsel refer, between the terms of the mortgage, which it authorizes, and the consideration which it recites as moving to the grant of the power; and if such inconsistency did in fact exist, the recital would not operate as a limitation upon the power. The instrument authorizes

the execution of a mortgage, not merely to pay the demands *within* the designated period, but it adds that the demands are to be payable " *as provided between the said D. O. Mills & Co. and said trustee.*" Inasmuch as at the time this power was executed the demands had all been past due for months, and no new agreement as to their payment had been made, the clause in question must be considered as referring to arrangements thereafter to be made, " as *may* or *shall* be provided." As we read the instrument, it amounts to this ; that in consideration of an agreement from D. O. Mills & Co. to postpone their demands for two years and a half, certain of the beneficiaries named in the declaration of trust authorize the trustee to execute the mortgage conditioned to pay such demands, with interest at one and half per cent. a month, *at such times within the two years and a half as may be arranged between him and the creditors in question.* On the part of D. O. Mills & Co., an agreement to postpone payment for two years and a half was desired ; on the part of the beneficiaries, the liberty to the trustee to make the payments *within* the prescribed period as might be most convenient, and be arranged between him and the creditors. Delay for a given period in the enforcement of existing demands was the object sought—not absolutely, but as the trustee, with knowledge of the probable means of meeting the demands, might agree with the creditors. The fact, therefore, that the trustee gave for the amount due D. O. Mills & Co. three notes, two of which were made payable within the prescribed period of two years and a half, and executed the mortgage for their payment, does not constitute any departure from the terms of the power. The departure arises from the fact that the third note is payable beyond the prescribed period, and is covered by the same mortgage. A power to execute a mortgage conditioned to pay certain demands within a designated period, is not followed by the execution of a mortgage to pay one portion of such demands within that period, and another portion within a different and further period. The mortgage, it is true, does not in terms prescribe or appoint a time of payment, but it does so substantially. Its condition is to pay the three notes and interest thereon according to their " true tenor and effect," by which we understand, according to the promises which they severally express, including those for payment at their respective maturities.

There is no doubt that the trustee designed to execute a mortgage in pursuance of the power. The reference to the power in the mortgage as the source of his authority in the premises, and the evidence given by him on the subject, are conclusive upon this point. The variation from its terms was the result of a mistake in the recollection of the trustee, the instrument not being before him at the time the mortgage was drawn. The delay between its date and the execution of the mortgage is satisfactorily explained. Negotiations were pending for the settlement of the claim of Raun. D. O. Mills & Co. were willing to give up the security to be afforded by the contemplated mortgage to them, in case Raun would come to an arrangement proposed and accept a like security. The arrangement proposed failing, the mortgage was executed. The object sought by its execution, so far as the delay desired in the enforcement of the demands of D. O. Mills & Co., has been accomplished; and it would seem that according to plain principles of justice the mortgagees ought not, under these circumstances, to be deprived of the benefits promised from their action. There would be some defect in the administration of justice if such a result should follow. Happily, in the jurisdiction which equity exercises in cases of defective execution of powers, protection is afforded against results of this character. " If there be a defective execution, or attempt at execution of a mere power," says Story, "there equity will interpose and supply the defect; not universally, indeed, but in favor of parties for whom the person intrusted with the execution of the power is under a moral or legal obligation to provide by an execution of the power. Thus, such a defective execution will be aided in favor of persons standing upon a valuable or a meritorious consideration; such as a *bona fide* purchaser for a valuable consideration—a creditor, a wife, and a legitimate child—unless, indeed, such aid of the defective execution would, under all the circumstances, be inequitable to other persons, or it is repelled by some counter equity." (Story's Eq. Jur. sec. 169.) Equity, says the same author, will not aid the nonexecution of a power, but " when the party undertakes to execute a power, but by mistake does it imperfectly, equity will interpose to carry his very intention into effect, and that, too, in aid of those who are peculiarly within

its protective favor—that is, creditors, purchasers, wives and children." (Vol. 1, sec. 170.) "Whenever," says the Supreme Court of Ohio, "the intention to execute a power is sufficiently manifest, but the execution is defective or has not been executed according to the terms, or in the form prescribed, equity will correct the mistake or supply the defect." (*Barr* v. *Hatch*, 3 Ham. 529.)

Upon well settled principles, then, equity will afford relief in the present case. This it will do by directing a correction in the condition of the mortgage, and then enforcing the mortgage in its corrected form; or by construing the defectively executed instrument in connection with the power to which it refers, thus qualifying and restricting the condition, and giving effect to the mortgage conformably to the intention of the donors of the power and of the trustee.

The condition of the mortgage being corrected, or qualified and restricted by reference to the power, (and it matters not which course be pursued under the stipulation of the parties) we proceed to declare the effect of the mortgage thus corrected or thus construed. The beneficiaries, in authorizing the execution of the mortgage, consented to a postponement of their rights of priority in the security furnished by the real property held in trust, and of course in its proceeds upon the settlement of the estate, to the claims of D. O. Mills & Co.; in other words, they consented that, to the extent of their respective claims, D. O. Mills & Co. should receive security and payment prior to them. They could not, of course, affect the rights of beneficiaries subordinate to them who were not parties to the power. They could, however, consent to exchange places with D. O. Mills & Co. in the security and in the payment of their respective demands; and this is the effect of the mortgage which they authorized the trustee to give. In the settlement, therefore, D. O. Mills & Co. are entitled to receive out of the proceeds of the real property, and to apply on their own demands, what would otherwise be first applicable to the claims of Haworth, Clark and Davis as *cestuis que trust* of the second class, and to W. T. Grissim as *cestui que trust* of the third class, and to Hatch as *cestui que trust* of the fifth and of the seventh class. Winans states in his brief that he

desires to be placed in the same position with them ; that, in fact, from a verbal promise to that effect, he has bound himself equally as if he had signed the· power.    These different beneficiaries (including Winans, upon his own admission) must therefore take in the order of their demands the position which, but for the power and mortgage, (and admission of Winans) would fall to D. O. Mills & Co.

In the fourth article in the declaration of trust, provision is made for " a suitable and reasonable compensation " to the trustee.    Trustees have a· right to claim a reimbursement of all expenses properly incurred in the execution of their trusts ; and also a suitable allowance for their own services.    The duties of the trustee in the present case were limited to the preservation of the property, the payment of the debt to the Frierson estate, the purchase and loccation of school warrants upon the farm, and the raising of a crop for the year 1856.    All expenses incurred for these purposes have been reimbursed to him.    The evidence in the case does not show much active participation of the trustee in the supervision over the farm whilst a crop was being raised in 1856, or much expenditure of time or labor in the purchase and location of school warrants. One thousand dollars, under the circumstances, we think ample compensation to him, and that sum is allowed, payable, according to the declaration of trust, after all the claims of the second and third class are satisfied.    We are speaking now of the allowance for services immediately and properly connected with the execution of the trust, as established by the papers executed in January, 1856.    With reference to the services in raising crops afterwards, under the authority, or rather without the objection of certain of the beneficiaries, he may be entitled to be reimbursed all the expenses which he has incurred, and to an allowance of the amount found by the referee ; but for such expenses and services he cannot make any claim upon the trust property.    He must look, as the parties who dealt with him must also look, to the results of the undertaking upon which they entered, or furnished the means for others to enter : that is, to the proceeds of the crops.

As to the expenses incurred in the present litigation, they have been occasioned in a great degree by matters not properly relating

to the execution of the trust, but by matters growing out of the subsequent action of the trustee, taken with the consent of a portion of the beneficiaries. The allowance to him, therefore, for the litigation must be limited, not by the actual expenses, but by such expenses as would reasonably be incurred in closing up the estate after the crop of 1856 was raised. One thousand dollars we think quite sufficient—one-half to be applied to the payment of the disbursements and the fees of counsel employed by the trustee in the lower Court, and the other half to the payment of like disbursements and fees in the appellate Court. This item is payable out of the proceeds before distribution is had to the beneficiaries.

It is unnecessary to consider the transactions of the trustee or of parties with him, in relation to the crops after 1856. Operations upon a farm, exceeding in extent three thousand acres, could not be carried on without large expenditures of money each year. Had those operations proved successful, there would probably have been little or no complaint at the investments made. Those operations having failed, the usual complaint, and censure, and charges of improvident conduct, consequent upon failure of an undertaking, have followed. It would subserve no good purpose to examine into these matters, for it is admitted by all the parties that the proceeds of the entire trust estate will not pay the *cestuis que trust* beyond those of the fifth class, even if they reach to that extent. We will therefore direct, by our decree, a sale of the real property, and distribution of the proceeds to the payment of the *cestuis que trust*, whose claims we have passed upon, and reserve any judgment upon the rights of the same or other parties to any proceeds which may remain after such payment.

The judgment of the Court below must be reversed, and the report of the referee set aside, and the Court below directed to enter a decree to the following purport: first, directing the trustee to sell the real property belonging to the trust estate—after due and proper publication of the time and place of sale—a survey of the same having been first made into parcels of not less than one hundred and sixty acres, nor exceeding three hundred and twenty acres each; second, directing the payment of the expenses of the survey and sale, and the payment of one thousand dollars for the

expenses of the present litigation; third, directing a distribution of the proceeds to the several beneficiaries entitled thereto, according to the views expressed in this opinion—D. O. Mills & Co. taking and applying to their own demands the proceeds, which, but for the power and mortgage referred to, (and consent of Winans) would be first applied upon the claims of the beneficiaries Haworth, Clark, Davis and Winans of the second class, to W. T. Grissim of the third class, and to Hatch of the fifth and seventh class; fourth, reserving the right of all parties, whether named or otherwise, to litigate with reference to any proceeds which may remain after the payment of the several beneficiaries mentioned in the declaration of trust. Each party will pay his own costs of the action, both in this Court and in the Court below.

By a supplementary opinion, the decree was modified so as to direct, upon the stipulation of the parties to that effect, the appointment of a commissioner to sell the real property belonging to the trust estate, and to distribute the proceeds; and so as to direct the payment of the costs of the several parties to the suits, other than the trustee, (for whose costs and disbursements provision was previously made) out of the proceeds. The decree was also modified so as to direct the Court below to take further proceedings for the disposition of any personal property belonging to the estate, and the distribution of its proceeds.